## BEATTY *et al.* v. GREGORY *et al.*

1. **Mining License:** EJECTMENT. A parol license to enter upon mineral lands and mine the same, for a specified share of the mineral raised, for an indefinite time, an entry under such license, and an expenditure of labor and money in sinking shafts, running drifts, procuring machinery, and other preparations for mining under such license, gives to the licensee a valid subsisting interest in the real estate which the licensor can terminate only by giving him compensation for such expenditure, or the notice necessary to terminate a tenancy at will; and the licensee may assert his right to the possession against the licensor, or his subsequent lessee with notice, by ejectment.

2. —— FORFEITURE OF MINING RIGHT. Whether the interest of a licensee in a mining license has been forfeited, terminated or abandoned, is a question of fact, upon which the parties are entitled to the verdict of a jury.

3. —— CUSTOMS OF MINERS. The lessee of mining lands is not bound by the private custom of the lessor, unless the lease was executed with knowledge thereof by such lessee or his assignor.

4. ——. The general established custom of miners enters into and forms a part of a lease of mining lands, in the absense of any express stipulation to the contrary, or of a private custom of the lessor which was known to both parties.

*Appeal from Dubuque District Court.*

TUESDAY, OCTOBER 11.

EJECTMENT — MINING RIGHTS — NATURE AND EXTENT OF LICENSES — WHEN REVOCABLE, WHEN NOT — CUSTOM OF

MINERS, &c. It will be necessary carefully to state this case, in order to understand the questions presented. The action was brought under chapter 144 of the Revision, to recover the immediate possession of, and the hereinafter described interest in, the following real estate, viz.: "The mineral diggings, shaft, crevice, drift and range thereto belonging, known as the Brugh crevice or diggings, and situate in the S. E. ¼ of sec. 33, T. 89, R. 2," &c. Plaintiffs allege, "that they have a valid subsisting interest therein, and the exclusive right to carry on the business of mining for lead ore, on said premises, subject to the payment of one-sixth of the mineral raised therefrom, as rent for the ground, under a miner's lease, for an indefinite period; that defendants keep them out of possession, to their damage $5,000, on account of the loss of rents and profits," &c. Dunn answers, disclaiming all interest. Gregory answers: 1st. By way of general denial; 2d. By claiming that he is in the rightful possession, as the tenant of one Richard Bonson, and, as such tenant, using the premises for the purpose of mining for lead ore.

From the testimony, all of which is before us, the following facts are either admitted or clearly shown, viz.:

First. That Richard Bonson was the owner of the mineral land, or lot, on which the crevice, range, or lead, called in the testimony the "Brugh crevice," was situated, this being the one in controversy in this action. In 1860, or 1861, the plaintiff, P. H. Brugh, began to work and mine on said premises. The plaintiff himself testifies, that he thinks he got the claim (or right to mine) from one Lockey, but Bonson testifies that Brugh obtained the right to work from him, and it is certain that the plaintiff did work with the assent of Bonson, agreeing to pay the latter as rent, or compensation, one-sixth of the mineral raised. No written contract or license is pretended. In the course of his work, Brugh sunk six shafts, in the fourth of which

a little mineral was obtained.  The plaintiff testifies (and Mr. Bonson admits the fact, in his testimony), that in June, or July, 1861, the damps were so bad that he concluded to quit till fall.  " I went to Mr. Bonson, and he inquired how I was getting on.  I told him how the damps were, and that I had to rig a furnace, and then could some days use only one blast a day.  I then told Bonson I would quit till fall, till I could run the drift.  This was either in 1861 or 1862."  [Bonson thinks it was in 1861, but don't recollect the time he gave Brugh.]  " Mr. Bonson then asked if I calculated to work this fall.  I said 'yes;' and he said, 'I shall reserve or keep the diggings for you, and you see me again.'  This was the last conversation I had with Mr. Bonson from that day to this."

Second.  Shortly after, that is, in 1861 or 1862, Brugh sold his right in the range, or diggings, to Charles Beatty, Henry Shuler, and either Owen or James Dunn (it is not material in this suit which) for $80, provided sufficient mineral to pay that sum should be raised from the premises; and these parties continued to hold, and more or less work on the premises in controversy, till (as defendants admit) February and March, 1863.  Shuler & Dunn (June 26th, 1863, according to Brugh's testimony) surrendered, as they had agreed to when they were done with them, " the premises back" to plaintiffs. Meanwhile, Beatty died, and his heirs join with Brugh in bringing this action.  When Shuler and Dunn quit work, they reserved windlass, tools, &c.; and no work was done from March, 1863, till September, 1863, when it was done by Gregory, one of the defendants, under permission from Bonson.  That is, though the plaintiffs claim that the premises were surrendered to them in June, they admit that they did no work upon them after that time.

For this failure the plaintiffs assign two reasons: 1st. That the plaintiff Brugh was sick, and that, being

sick, his right, under the *custom of miners*, would not be forfeited by non-user while sick. 2d. That the damps prevented working the mine, even if he had been well. 3d. Gregory and Dunn commenced to work on the premises with the knowledge of, but without objection at the time, from the plaintiffs. Brugh's testimony on this point is: "I was at work three or four hundred yards off when I heard that they jumped the claim; heard, but did not go over; do not know, but probably saw them (defendants) every day." Defendants cleaned out the shaft, sunk it a foot deeper; drifted fifty feet, and found a small piece of mineral; drifted twenty feet further, and found another piece, and at one hundred feet 300 pounds," &c. At the end of about five or six weeks, 20,000 pounds of mineral were raised, worth from $55 to $60 per thousand pounds. Afterwards this suit was brought. The above outline of the material portions of the testimony is probably sufficient to exhibit the nature of the controversy between the parties, and to make intelligible the questions of law raised on the trial. It will be seen by this statement that a most material question on the trial was, *whether the plaintiffs' rights were forfeited or abandoned, by reason of a failure to work on the premises from March,* 1863, *till September,* 1863. To establish that they were abandoned or forfeited, the plaintiffs claimed the right to show that by the *general custom* of miners, bad air or sickness of the miner, will, while it lasts, operate to hold the ground and preserve the right. Mr. Bonson testifies that it was an uniform rule with him, "that a tenant loses his right when he ceases to work." He did not testify that Brugh knew of this rule, but stated facts from which a jury might perhaps infer it. Brugh in his testimony, however, denied any knowledge of this rule. The court refused to allow the general custom of miners to be shown as to the effect upon their mining rights of tenants quitting work. To this the plain

tiff excepted, and also excepted to the court's allowing Mr. Bonson to testify as to his private rules, without connecting the plaintiffs with knowledge thereof. The other facts, so far as material, will be stated in the opinion. There was a trial by a jury, who (under instructions from the court also excepted to) found for defendants. Plaintiffs appeal.

*John H. O'Neill* and *Alonzo Cragin*, for the appellants, cited Bainbridge on Mines, 84, § 1, 124; *Clayton* v. *Blakely*, 8 Term R., 3; *Comyn* v. *Kynsto*, Cro. Jac., 150, and the cases there cited; *Cullen* v. *Rich*, Bull. N. P., 102; *Andrews* v. *Whittingham*, Carth., 277; *S. C.*, 1 Salk., 255; *Crocker* v. *Fothergill*, 2 B. & Ald., 652; *Wilson* v. *Mackreth*, Burr., 1825; *Doe* v. *Taylor*, Moore, 355; *Northam* v. *Bowden*, 24 L. J. N. S. Exch., 237; Coll. on Mines, 18; *Doe ex dem. Hanley* v. *Wood*, 2 B. & Ald., 724; Adams' Eject. (4th ed.), 20.

*Monroe & Deery* for the appellees.

DILLON, J.—I. Chapter 144 of the Revision provides, that "any person having a *valid subsisting interest* in real property, and a right to the immediate possession thereof, may recover the same by action." § 3569. Assuming, for the present, that the plaintiffs' rights, as the parol licensees of Bonson, the owner, had never been forfeited or terminated, the first question is, can they assert those rights in *this form of action?* Let us suppose a simple and uncomplicated case, and one which, from the testimony, we infer to be of not unfrequent occurrence: Mr. Bonson, as the owner of a large quantity of mineral lands, is applied to for the right to mine upon them. He replies: "I will give you the right you desire, you paying me as rent, one-sixth of all mineral discovered." Nothing is said as to the duration of the right, or the mode of termination. The miner, upon the faith of this permission

*1. MINING LICENSE: ejectment.*

takes possession, expends his labor and money, in sinking shafts, running drifts, purchasing tools, providing machinery, &c. Laying out of view any rights derivable from custom, and applying to the case (in the absence of special contract regulating the rights and duties of the respective parties) the ordinary rules of the law, can the owner instantaneously and absolutely revoke the license, so as, from that moment forward, treat the miner as a trespasser or intruder? Most clearly not. It would be a shame and reproach to the law, if this could be done. The general principles of the law are against it. (*Winter* v. *Brockwell*, 8 East, 308; *Wickersham* v. *Orr*, 9 Iowa, 253, 260, and cases there cited; *Rerick* v. *Kern*, 2 Am. Lead. Cases, and the valuable note of the learned editors, and authorities there collected, as to executed licenses.) And, in the absence of an established custom, or usage, or contract, giving larger or other rights, such a miner being in possession of real estate, with the *assent of the owner*, would, by *statute*, be a *tenant at will* (Rev., § 2216), and entitled to the rights of such a tenant, in regard to notice to quit.

Considering the importance of the lead mining interests of Iowa, that the rights of owners and miners are wholly unregulated by statute, it is surprising that so little litigation growing out of this great interest, has ever reached this court. And yet, in almost the only case ever before it at all similar to the present, and which counsel seem to have overlooked, the above principles are directly asserted and enforced. *Bush* v. *Sullivan*, 3 G. Greene, 344. In that case the defendants were in possession of the plaintiff's mineral land, by virtue of an unlimited parol license, and had made large expenditures in improving the ground, under an arrangement that the plaintiff was to have one-fourth of the mineral raised, as his rent, and the plaintiff brought ejectment. There was no question of rights under a custom in the case; and the court held that the owner

could not maintain his action without refunding the expenditure, or giving the notice to which a tenant at will is entitled. While some of the observations *arguendo* in that case may admit of question, the *decision* itself, under the facts, was just and proper. If the miner has, under such circumstances, such rights as that he cannot be ejected by the owner, it seems to us to follow that he may, by virtue thereof, assert his right to possession against the owner, and his subsequent lessee or licensee with notice, if they unjustly interfere with it. In the case at bar, the following, with the exception of an introductory statement, constituted the entire charge of the court to the jury:

2d. "To sustain this action on the part of the plaintiffs, all the evidence introduced by them tends to prove that the only interest of the plaintiffs in the premises claimed, consists in a license to work and mine on the premises described in the petition, under a parol license from Richard Bonson, the owner in fee of the premises, which right so tending to be proved, is a simple right to enter upon the premises, under such license, and to dig and search for lead mineral therein, and for no other purpose, and without any property in the minerals, if any, on the premises in the plaintiffs until discovered by them."

3d. "In my opinion, this does not tend to prove such an interest in real estate, in the premises, in the plaintiffs, as entitles them to maintain this action and recover therein. And there being no evidence before you of such a title and interest in the plaintiffs, in the premises, as will entitle them to recover, the defendants are entitled to your verdict."

Whether the interest of the plaintiffs had ever been forfeited, terminated or abandoned, was one of fact for the jury, to be determined by them from the evidence under proper instructions. This question, the plaintiffs, by their instructions (all of which were refused), sought to get before the jury. And whatever may be our

2. —— Forfeiture, etc.

opinion upon the evidence, as it now stands, as to the abandonment of their right by the plaintiffs, we are clear that they had the right, under our statute and practice, to have this question distinctly submitted to, and decided by, the jury.   In considering, therefore, whether the case ought to be reversed for error in the above charge, we must assume that the plaintiffs took possession with the consent of Bonson, expended money and labor on the faith of such consent, and that their right had never been forfeited or abandoned.   On this assumption, it is our opinion that they would have such an interest in real estate as would entitle them to bring an action in this form to recover it, and thus be restored to their crevice or diggings.   Such being our opinion, upon the general principles of justice and law, let us now take a brief view of the authorities to see whether this opinion is in harmony with adjudged cases.   The general rule is, that ejectment will lie for anything of which the sheriff can deliver .possession.   Therefore, it may be maintained for corporeal, but not for incorporeal hereditaments.   Adams on Eject., ch. 2, pp. 18, 20, and cases.   As applicable to miners and mining interests, this distinction results from the above rule : a *privilege to dig*, not amounting to an actual demise of the mines, is an incorporeal hereditament, and, consequently, ejectment will not lie. *Doe, ex dem. Hanley*, v. *Wood*, 2 B. & Ald., 724 ;   *Lord Mountjoye's Case*, 4 Leon., 147 ; *S. C.*, Godbolt, 17 ; *Cheatam* v. *Williamson*, 4 East, 469 ;   *Crocker* v. *Fothergill*, 2 B. & Ald., 661, judgment of HOLROYD, J. ; and see *Wilkinson* v. *Proud*, 11 M. & W., 33 ; and *Stoughton* v. *Leigh*, 1 Taunt., 402.   And especially under the above authorities is this so, where such license is not exclusive and does not oust the grantor of his rights.

But a distinction, in many cases, is drawn between an unopened and an *open* mine.   And the books abound with cases, from a very early period, which decide that

ejectment will lie for mines, though another has the surface. We refer to the following: *Comyn* v. *Kinyto*, Cro. Jac., 150. In *Whithingham* v. *Andrews*, 1 Salk., 255, "it was not questioned (citing Cro. Jac., 150) that ejectment lies of a coal mine;" *S. C.*, Carth., 277, S. P.; *Comyn* v. *Wheatley*, Noy; 121 ; and see *Lewis* v. *Branthwaite*, 2 B. & Ald., 437; Bainb. on Mines, 493, 494; Collier on Mines, 18 (top); Adams on Eject., 20 (marg.); *Doe, ex dem. Hanley*, v. *Wood*, 2 B. & Ald., 724, and cases cited *supra*. Many of these cases, while holding that ejectment lies for an open mine, throw no light upon the question as to *the interest in the plaintiff* necessary to maintain the action. On this subject, Mr. Adams is of opinion (Eject., page 20, marg.) that " when a grant of mines is so worded as not to operate as an actual demise, but only license to dig, search for, and take metals and mineral within a certain district, *it seems that a party claiming, under such a grant, and who shall open and work, and be in actual possession of, any mines, may, if ousted, maintain ejectment with respect to them ;* but he cannot maintain ejectment, either in respect of mines within the district " (i. e., lying within the bounds of his privilege), " which he has not opened, or which, having opened, he has abandoned." See, also, Bainb. on Mines, 494; Collier on Mines, 18. We are satisfied that this rule is a reasonable one, and we adopt it as being the law. The court's charge, it must be observed, omits any allusion to the material facts of possession and expenditures of money and labor by the plaintiffs, under the license from Bonson. The questions in the case should have been submitted to the jury, thus: " Were the plaintiffs' rights forfeited or abandoned? If so, that is an end of the case; if not, that is, if those rights were still subsisting and had not been determined by abandonment or forfeiture, then, as they had taken actual possession and expended money, they would ·be entitled to be

restored to the possession of their mining right. What they could recover as damages or rents and profits, with respect to the mineral raised by the defendants, has not been discussed by counsel, and we pass the question by as not being necessarily before us. See observations of ABBOTT, Ch. J., pp., 738, 739, in the above cited case of *Doe, ex dem. Hanley*, v. *Wood*. Our conclusion, then, on this part of the case, is this: Omitting any allusion to the charge as trenching upon the province of the jury, it was, agreeably to the above views and authorities, correct as to the rights of a bare licensee, without actual possession, or the right to actual possession. But the error consists in taking from the jury, against the objection of the plaintiffs, the question whether the plaintiffs had abandoned, or lost, or forfeited their actual possession, or right to actual possession. If not, the jury should have been charged that they had such an interest as would entitle them to maintain ejectment.

II. We also think the court below held too tight a rein 3 and 4. — upon the plaintiffs in refusing to allow them to
Custom of miners. show the *general custom* of miners. The plaintiffs offered to show what, by the general custom of miners, was the effect upon the miners' right, license or claim, as to forfeiture by reason of a failure to work the ground, and to show that sickness or bad air would, for the time being, under the custom of miners, excuse continuous working and prevent the forfeiture of the right which would otherwise take place.

This testimony seems to have been rejected on the ground that there was a "local or private custom in regard to this particular land." This refers to the testimony of Mr. Bonson, the owner, who stated: "This rule is an uniform rule with me, that a tenant loses his right when he ceases to work." "When I know damps to exist, I do not resume the ground." "If a man was sick and unable to

work for two weeks, and I knew it, I would not resume the ground." "My rules have never been written or published, I keep them only in my mind." "These are my rules as laid down in the neighborhood." "If a person comes to me to rent ground, I ask him if he knows my rules, and he says 'yes,' I say 'go to work.' If he says he does not, I tell him my rules." "*I do not remember as I ever talked with Mr. Brugh* (the plaintiff) about any of my rules." Mr. Brugh testified that he "did *not know* any of Bonson's rules, except his right to a preference of mineral obtained on his premises." Under these circumstances the jury should, in substance, have been directed:

1st. That Bonson's private rules would not affect the plaintiffs' rights, unless they had knowledge thereof; or unless they held, as the assignees of persons who had such knowledge, and whether they or their assignors had such knowledge, would be for the jury to determine from the evidence. If the plaintiffs had such knowledge, these rules would constitute part of the contract, and evidence of any *general custom* inconsistent with, or different from them, would be disregarded.

But, 2d. If the plaintiffs had no knowledge of Bonson's rules, and if there was no contract with respect to the assignment or duration, forfeiture or mode of termination of the plaintiffs' rights, these matters would depend upon a general custom in these respects, and upon the law. The custom (which is evidenced and proved by usage. 2 Parsons on Contr., 55–56 and notes) must be *established*, and not casual (though no particular length of time is necessary to establish it), *uniform*, and not fluctuating (when contracts are not made to the contrary), and *general*, that is, general among mineral land owners and miners. The *onus* to establish such a custom is on the plaintiff. If, for example, there is an established custom generally understood and received, that sickness or bad air, when nothing

.is said to the contrary, shall excuse, while it lasts, actual working, then a license given in a place where such a custom exists, would be presumed to have been made with reference to it; and such a custom would be considered as being tacitly annexed to and as forming a part of the contract between the parties. The same observations will apply as to the right of the licensee to assign and sell his privilege. In the absence of any contract or established custom, the right of a licensee to dig, paying a part as rent, would, by the law, be considered personal, for otherwise a license to A. would practically be one to B., and the owner's rights might be seriously affected. But a *general custom* recognizing the assignability of these mining rights would probably not be so unreasonable as to prevent its being upheld.

3d. Where there is no special contract, and no general custom, the general rules of law govern the rights of the parties; and these, so far as they arise on the record, have already been sufficiently adverted to. The novelty and importance of the case clearly justify the space it occupies. It has been found impossible to treat it with greater brevity, and yet to treat it with clearness and precision. For the reasons above indicated, the judgment of the District Court is reversed, and the cause remanded for a new trial.

Reversed.