## THE SOUTHWESTERN RAILROAD *vs.* MITCHELL.

[Speer, Justice, being disqualified, did not preside in this case.]

1. The finding of the jury was supported by the evidence; and there was no error in the questions submitted by the court to the jury, nor in the charge giving explanations of each, and the law thereon.
2. Where one owning the fee in certain land gives by parol a license to another to erect a part of a mill dam on such land and to overflow a part thereof, having in view the benefiting of the licenser's estate, and at the expense of large sums of money the licensee executes the contract and builds the dam and a mill (useless without the dam), and does thereby benefit the licenser's estate, equity will not permit the latter to revoke the license at will and without remuneration.

(*a*.) That the licenser is a railroad company will not alter the principle unless the purpose of the franchise—the safe running of the road for the benefit of the public—be impaired by such license. Should it be found necessary for such purposes, even after injunction restraining interference with the license, the license could be annulled upon such terms as equity would impose, and such is the decree in this case.

(*b*.) One who purchased from the licensee upon the assurance of the

general superintendent of the road that he would not be molested in respect to the mill, dam, or overflow, will be protected in the same manner as his vendor.

(*c.*) Where the general superintendent, the chief executive officer of a railroad, whose duty it was to manage the business of the road, the construction of its culverts, etc., granted a license to an adjoining landowner to erect a mill-dam partly on the land of the road, and overflowing a part of such land, and the same was done at large expense by the licensee, and was beneficial to the road, there having been no objection from any source, the company is bound. Especially so where the mill and dam were in plain view of the railroad for years, and no objection was made to them by the directors, and where the superintendent was himself a director.

3. That the dam was washed away by a flood would not destroy the right of the licensee or one who purchased under him for value and on the assurance of the superintendent that he would not be molested, where it appeared that there was no fault or laches on his part causing delay in rebuilding.

December 12, 1882.

Railroads. Corporations. Estoppel. Principal and agent. Easements. Before Judge CRISP. Sumter Superior Court. April adjourned Term, 1882.

To the report contained in the decision it is only necessary to add the grounds of the motion for new trial, which were, in substance, as follows:

(1.) Because the answers of the jury to the questions propounded to them were each contrary to law, evidence, and the charge of the court.

(2.) Because the court erred in propounding to the jury each of the following questions:

(*a.*) Did Coker have permission to build the dam and overflow the land of the railroad? If he did, who gave him such permission?

(*b.*) Did Mitchell, before he bought, have a conversation with Virgil Powers, superintendent, about the overflow of the railroad land? If yes, what did Powers state to Mitchell as to Coker's right to overflow said land?

(*c.*) If Mitchell had a conversation with Virgil Powers

before he bought from Coker, what did Powers say, if anything, as to whether he, Mitchell, could keep the land overflowed; and would Mitchell have bought said property from Coker but for said statement?

(*d.*) Has the railroad been benefited in any way by the construction of said dam, or the digging of the race, or the flooding of the land? If yes, state in what such benefit consists.

(*e.*) * * * Did Mitchell abandon the right to rebuild the dam, or did he then intend to rebuild it, and try so to do?

(*f.*) What officer of the railroad had the general superintendence of its affairs during the years 1866, 1867 and 1868? [This covers the time when it is claimed the license was granted, and when the conveyance to Mitchell was made.]

(3.) Because the court erred in charging the jury as follows: "The first question is, did Coker have permission to build the dam and overflow the land of the railroad? If he did, who gave him such permission? You understand that the dam is built upon the land of the railroad, and that dam causes the water to overflow the railroad land; that is admitted. The question is: Did Mr. Coker, who built it, have permission to do so? If he did have permission, from whom did he get it? That is plain. I want you to answer that. If he had permission, you will say he had permission, and he got it from so and so. If he did not have permission, of course you will say he did not have it. The next question is: When was the dam built and the land overflowed? Give the date— the year."

(4.) Because the court charged as follows: "When did Mitchell buy the mill property? Did Mitchell, before he bought, have a conversation with Virgil Powers, superintendent, about the overflow of the railroad's land? If yes, what did Powers state to Mitchell as to Coker's right to overflow said land? That means this, whether Mitchell

talked with Powers before he bought, and what Powers said as to Coker's right to overflow the land, if Powers said anything. If he did say anything upon that subject, state what he said; if he did not, of course you answer that he did not say anything upon that point."

(5.) Because the court charged as follows: "If Mitchell had a conversation with Virgil Powers before he bought from Coker, what did Powers say, if anything, as to whether he, Mitchell, could keep the land overflowed? And would Mitchell have bought said property from Coker but for such statement? You see the difference in this question and the third one; that one seeks to ascertain what Powers said as to Coker's right to overflow this land of the railroad; this seeks to find out what, if anything, Powers said as to Mitchell's right to keep it overflowed, to keep that overflow of water upon the land. You see the distinction between the two interrogatories; one seeks to find what, if anything, Powers said as to Coker's right to flood this land, and the other, as to what, if anything, Powers said as to Mitchell's right to do so. I don't wish you to understand or infer, by any means, that I mean to say that Powers made any statement about it at all; that is not what I mean. The intention of the court in putting that question to you is not to intimate that it is true but that it is a controverted question. I don't say, or intimate, that Mr. Powers made any statement to Mr. Mitchell about his right or Mr. Coker's right. I don't want you to infer from the fact that I have framed the question upon that point, that I have any opinion or conviction upon the subject. You are the gentleman to pass upon that point, uninfluenced by any question or interrogatories of the court."

(6.) Because the court charged as follows: "Has the railroad been benefited in any way by the construction of said dam? or the digging of the race? or the flooding of the land? If yea, state in what such benefit consists. The defendant claims that the building of this mill and

dam was a real benefit to the railroad, and that that was the inducement that the railroad had to let them put it there. Of course they must show that by the evidence; the mere fact that they contend for it don't make it so; it must appear by the proof in the case. If you believe that the railroad has been benefited, I want to know how; I don't want you to say that the railroad had been benefited simply; I want you to state how; if the evidence shows you how it has been benefited, of course you will put it there in your answer; if the evidence fails to show it, of course you will say it has not been benefited."

(7.) Because the court charged as follows: "When was the dam broke? Why was it not rebuilt? Did Mitchell abandon the right to rebuild it? or did he then intend to rebuild it, and try so to do? The purpose of that question is this; the dam was broken, and was not immediately rebuilt, now I want to know why it was not rebuilt. Was it not rebuilt because he had an intention not to rebuild, or because he could not get it rebuilt immediately because he could not secure a person to rebuild? I want to find out from your answer to this question whether the dam was not rebuilt because at that time there existed in his mind an intention to abandon the enterprise, or whether there existed an intention to rebuild at once, which was not carried out because he could not get it rebuilt immediately."

. (8.) Because the court charged as follows: "Was Mitchell solvent or insolvent at the time of the filing of this bill? A person is insolvent in Georgia when he has not got enough property to pay his debts. If a man owes more money than he has got property to pay, then he is insolvent, no matter whether the debts which he owes be as principal or as security for somebody else. You look to the evidence upon this point, and answer the question propounded."

. (9.) Because the court charged as follows: "What officer of the railroad had the general superintendence of

its affairs during the years 1866, 1867 and 1868? I will tell you what I mean by that—what officer had general supervision of the running of the cars, the railroad and the right of way, looked after the agencies, and looked after the general property and general concerns of the railroad and had general superintendence of its affairs. A railroad company must act through its agents; it can" talk nor speak, nor look after its own affairs or property, it being a corporation must act through its duly authorized agent. I want to know what officer had general supervision or superintendence of its affairs. If you can find from the evidence what or who that officer was, you will say, in reply to this question, who it was. If you cannot find out from the evidence who it was, you will so state."

The motion was overruled and complaint excepted.

LYON & GRESHAM, for plaintiff in error.

FORT & SIMMONS, for defendant.

JACKSON, Chief Justice.

This bill was filed by the South Western Railroad Company against Mitchell to restrain him from erecting a dam across a stream by which certain lands of complainant would be overflowed to their irreparable detriment, it being part of the right of way of the company. The temporary injunction was granted, and the case on the merits came on for trial, the defendant denying the main allegations in the bill, and setting up that he bought the land, mill, etc., from one Coker, who had authority to erect the dam from the company, and before he did buy he enquired of the Superintendent of the road, etc., of the company, by whom he was informed that Coker had the right to overflow the land and that defendant would be safe in buying the land.

The jury found a special verdict on the facts as follows:

"Question 1. Did Coker have permission to build the dam and overflow the land of the railroad? If he did, who gave him such permission?

Answer. Yes, Coker had permission. Virgil Powers.

Q. 2. When was the dam built and the land overflowed? Give the date and the year.

A. We do not know.

Q. 3. When did Mitchell buy the mill property? Did Mitchell, before he bought, have a conversation with Virgil Powers, superintendent, about the overflow of the railroad's land? If yes, what did Powers state to Mitchell as to Coker's right to overflow said land?

A. Bought 28th December, 1868. Mitchell did have a conversation with Virgil Powers about the overflow.

Q. 4. If Mitchell had a conversation with Virgil Powers before he bought from Coker, what did Powers say, if anything, as to whether he, Mitchell, could keep the land overflowed? and would Mitchell have bought said property from Coker but for such statement?

A. Powers said to Mitchell that he would not be molested; that the railroad authorities would not deed away any land, but always encouraged such enterprise. Mitchell would not have bought said property but for the above conversation.

Q. 5. Has the railroad been benefitted in any way by the construction of said dam, or the digging of the race, or the flooding of the land? If yes, state in what such benefit consists.

A. Yes; the railroad has been benefitted by the raising of the dam, and thereby raising the dirt road near the railroad, and by raising the water around the culvert causes the sand to settle around the abutments.

Q. 6. When was the dam broke? Did Mitchell abandon the right to rebuild it, or did he then intend to rebuild it, and try so to do?

A. Dam broke in fall of 1879. Not rebuilt on account of not procuring a competent mechanic. Mitchell did not intend to abandon the mill; he did intend to rebuild, and did try so to do.

Q. 7. Was Mitchell solvent or insolvent at the time of the filing of this bill?

A. Mitchell was solvent.

Q. 8. What officer of the railroad had the general superintendence of its affairs during the years 1866, 1867 and 1868?

A. Virgil Powers.

W. H. Matthews, Foreman."

Thereupon, and on the facts admitted, the chancellor entered the following decree:

"The above stated case coming on for trial, upon request of counsel under the statute, controverted questions of fact only were submitted to the jury—the jury having answered the questions propounded to them, as will appear by their verdict returned and recorded on the minutes of this Court. On said verdict, and the admitted facts, this decree is entered. The admissions were that in 1867 or 1868 Coker built the mill; that part of the dam was on the land of complainant, known as the right-of-way of complainant, and caused the water to overflow a part thereof; that the dam is still broken; that Virgil Powers was a director and superintendent, Walden, road master, and Poole, supervisor of complainant, from 1866 to 1869 inclusive. Whereupon it is considered, ordered and decreed by the court that the injunction prayed for by complainant be and the same is refused and denied. It is further ordered that the complainant, the Southwestern railroad, be, and it is hereby, perpetually enjoined from interfering with respondent in keeping and maintaining a dam for mill purposes at the point where the dam now is, provided the respondent shall not have the right to back water on the land of complainant to any greater extent than it has been done heretofore. Should it ever become necessary to the prudent, proper and successful running and management of the Southwestern railroad that it should have the exclusive use and occupancy of the property with which they are herein enjoined from interfering, then nothing in this decree shall be construed to prevent it from proceeding to acquire the same in any lawful way or manner it might do had the title thereto never been in said railroad. It is further decreed that the complainant, the Southwestern railroad company, do pay the entire costs of this case, the same to be taxed by the clerk of this court. Decree signed June 6th, 1882. C. F. CRISP, J, S. C. S. W. C."

To the refusal of the court to grant a new trial before the jury and to the rendition of the decree the railroad company excepted, and bring the case before the court.

1. The motion for a new trial is based upon the allegation that the answer to every question by the jury is contrary to evidence, and that the charge of the court upon the law relative to certain questions is erroneous, as well as the propounding of other questions, all of which are set out in the report at the head of this opinion with the facts of the case.

There is evidence to support the finding in answer to each question; the presiding Judge approved the finding,

and the well settled law is that this court in such cases does not interfere. We see no error in putting the questions to the jury which are excepted to, or in the charge giving explanations of each and the law thereon. The court below failed to discover any finding contrary to the charge, and we see none.

2. The facts of the case then are those found by the jury, and the question narrows to this: Is the decree thereon right? Those facts are that Coker had permission from Powers to build the dam and overflow the land; that Powers had the general superintendence and management of the road when he gave the permission; that before Mitchell bought of Coker he enquired about this license, and Powers, still superintendent, told him that he would not be molested in keeping the land overflowed, that the company would not deed away the land, but always encouraged such enterprise, and that Mitchell would not have bought but for this assurance; that the company has been benefited by the dam and raising the dirt road near the railroad, and raising water around the culvert so as to settle sand around the abutments; that the dam broke in the fall of 1879, was not rebuilt on account of failing to procure a competent mechanic, but that Mitchell tried to do so and failed, and that Mitchell was solvent. The admissions were that Coker built the dam, that part was on the land of the company and was still broken, that Powers was superintendent and director, Walden road-master, and Poole supervisor. On these facts did the chancellor err in decreeing a perpetual injunction against the company restraining them from all interference with defendant's dam and mill, as prayed for in answer as a cross-bill, but providing that the company could acquire the property whenever it should be necessary to the successful running of the road?

It is to be observed that the fee to this land is in the railroad company. The entire doctrine of eminent domain is therefore out of the case. It can do what it pleases

with the land it absolutely owns, unless the great purpose of the franchise—the safe running the road for the benefit of the public be thereby impaired. In the event it should be found necessary hereafter that the land free from over-flow be used for this great purpose, it can be done by the obtaining according to law the anulling of this license, upon such terms as equity would require, as the decree de-clares. Up to this time no such necessity appears. And the license from this corporation, holding the fee in this land, will work precisely the same right in the licensee as would be conveyed by any natural person owning the fee.

Where, then, a grantor, owning the fee in lands, gives by parol a license to another to erect a part of a mill dam on the grantor's land and to overflow a part of that land, in the view of benefiting his own estate, and at the ex-pense of large sums of money the licensee executes the contract, builds the dam and a mill—useless without it, and thereby does benefit the grantor's estate, what will equity do? Upon great fundamental principles of right, it will not permit the grant or to revoke and annul the license at will and without any remuneration, but the contract being executed and money expended in its execution, it must hold the grantor to the continuance of the license, unless he pay the licensee for its revocation.

Authority is abundant to sustain a principle so just, and without referring elsewhere our own reports are full of it. In 3 *Kelly*, 82, it was first announced, and Judge Lump-kin cites many authorities, and concludes that such exe-cuted licenses at expense to the licensee are irrevocable. This case is followed in 12 *Ga.*, 239, in a decision rendered by Judge Nisbet, where the same conclusion is reached, and the licensee, when he has expended money upon the faith of the license, is said to occupy the position of a purchaser for value, and the grantor cannot revoke at will. The case in 3 *Kelly*, is very similar to the case at bar. There was a parol license to overflow his land by a coterminous owner of a tract to his neighbor, the erection

v 69—9

of a dam, mill, etc.   Here the licensee and the grantor, the company, are coterminous owners of adjoining lands too, and the license is given and the dam and mill are built.   That case rules this, unless a corporation has greater rights, when it owns the fee to real estate, than a natural person, which I do not suppose will be seriously insisted upon.   Other cases to the same effect may be found in our following reports, but these from the earlier books are sufficient to establish the principle.

Did Mitchell lose any right which Coker acquired? Hardly, we think, when Powers told him to buy, and that he would not be molested in respect to this dam and mill and overflow.

Does it make a different case in equity that a storm and flood swept away the original dam?   Not under the facts here found.   The mill stood.   The mill was built at expense on the same faith in the license, and is useless without the dam.

Did Powers bind the company by the parol license? He was their general superintendent, their chief executive officer, their agent about all such matters as the management of the road and its way and preservation.   The culvert necessary to the road was benefited, the business promoted by the mill, and to look especially to such things was his duty.   He saw the mill go up, the dam constructed, the money spent, and gave the license, and acquiesced for years in its use after its execution.   He was director as well as general manager.   If he could not bind the company, what agent could?   If no agent could, then indeed may a corporation do what it pleases without question from any power because it can only act by agents.

But the directors all acquiesced.   For years the dam and mill and overflow were in sight of the road over which they travelled, and no word of complaint was heard.   If it was their duty to inspect, they ought to have seen it all; if it was the superintendnt's duty, he ought to have seen it.   If it was nobody's duty, is it law or justice that if one

expends his money on the license given him by the general manager of the company, and nobody stops him from working on the land of the company and using it at much expense for years, he should fail to acquire rights because the company employed nobody to look after its property? We cannot think so, nor can we find any authority for such reward of such laches.

3. But one point insisted on in argument remains, and that is that the flood swept away the dam and the defendant was too slow in rebuilding and thereby lost his right· But the evidence is conclusive that he immediately or very shortly employed a mechanic who could not work for him at once, and the jury found that he did not abandon his license. Without laches or fault with him, equity will not suffer the providential occurrence to debar him of what he has paid for, standing as he does on the footing of a purchaser for value, as held in 12 *Ga.*, *supra.*

In reviewing the entire case, we cannot see that taking the facts found by the jury for true, and there is evidence to support them, the court erred in the decree. It must therefore be affirmed.

Judgment affirmed.