## CHARLESTON.

PIFER *v.* BROWN.

Submitted January 29, 1897—Decided April 21, 1897.

1. PAROL LICENSE—*Drainage—Revocability of License.*
   A parol license from one lot owner in a town to another to pass a tile drain under the former's lot for the purpose of draining the lot of the latter is revocable at the pleasure of such licensor. (p. 427.)

2. EASEMENT—*Deed—Drainage.*
   To entitle a party wishing to drain his lot under the surface of his neighbor's lot by a right not subject to revocation at the will of such neighbor, the privilege of so doing must be acquired by deed. (p. 427.)

3. EASEMENT—*Deed—Drainage.*
   The right of drainage through the lands of another is an easement requiring for its enjoyment an interest in such lands which cannot be conferred except by deed or conveyance in writing. (p. 426.)

Appeal from Circuit Court, Upshur county.

Bill by F. C. Pifer against Margaret N. Brown. Decree for plaintiff, and defendant appeals.

*Reversed.*

SAMUEL V. WOODS, for appellant.

U. G. YOUNG, for appellee.

ENGLISH, PRESIDENT:

This was a suit in equity instituted in the Circuit Court of Upshur county by F. C. Pifer against Margaret N. Brown. The plaintiff in his bill alleged that he was the owner of a lot of land in the town of Buckhannon, in said county (describing it; and exhibiting a copy of the deed from John D. Martin and wife to himself, dated the 3d December, 1884), and further says that in the month of October, 1894, after a destructive fire in said town, the frame building owned by him, in which he carried on business as a druggist, was completely destroyed; that he at once set to work to erect an expensive brick building on said lot, and had made excavations for a ground room or

cellar extending several feet below the surface of the earth, and constructed around it a stone wall, —— feet thick, for a foundation to the main structure, and as a part of said underground room; that said wall and foundation is of solid stone masonry, and built at very great expense; that in order to make said lower ground room useful, and to maintain good sanitary conditions about said building, it was and is necessary to keep said room or cellar well drained, and to this end plaintiff constructed a ditch from said room or cellar, by the most natural and practical course of drainage, through the lands or lots of adjoining owners to the nearest running stream or brook leading to Fink's run, and thence to the river; that plaintiff first obtained permission from all of such owners before proceeding to construct said underground sewerage; that among the lots through which said underground sewerage was constructed was a lot owned by the defendant, which was conveyed to her by Tom G. Brady and wife by deed dated the 3d day of May, 1886, a copy of which deed is also exhibited. The plaintiff further alleges that, before doing any work on said sewerage, he went to Dr. R. L. Brown, the husband of the defendant, who, acting for the defendant, agreed with plaintiff, and gave him permission to construct said sewerage through the lot of defendant upon condition that he (the said Brown) and the defendant should be allowed to tap said sewerage, if at any time said defendant desired to do so, to drain her own property, to which plaintiff assented; that while plaintiff was constructing said sewerage, but before any work had been done upon the property of the defendant, plaintiff went to the defendant, and said to her that he hoped she would not think he was taking too much liberty with her property; that he had had an understanding and agreement with her husband, Dr. R. L. Brown, about constructing an underground sewerage through her lot, and defendant replied to plaintiff that it was all right, to go ahead with his work, which plaintiff did; that plaintiff dug a ditch through the garden part of defendant's lot, as well as through the lots of the other property owners, leading from the lower room or cellar of his said lot, for the purpose of draining it, about four feet deep, and placed therein well-jointed earthen tiling, six inches in diameter, the whole distance

of said ditch, and, after so planting said tiling, plaintiff filled in the dirt on said tiling, completely covering the same and completely filling said ditch; that said drain or sewerage was constructed at great expense to plaintiff; that it extends through the property of the defendant for the distance of about fifty feet; that defendant lives on said lot, and was living on the same when plaintiff was having said ditch dug and said tiling put down, and saw said work being done, and permitted and agreed to the same; that plaintiff, as part of the consideration, put in a six-inch tiling to drain the property of defendant, if at any time she desired to tap the same, at an additional cost to him, when a two-inch tiling would have fully answered his purpose; that it is absolutely necessary to the use of plaintiff's property that said underground sewerage and drainage be constructed, and that it is very essential to the health of the town that it be drained; that said ditch does not in any way interfere with the use of defendant's property, and in fact benefits it, by serving as drainage of the surface water which collects on said lot of defendant, which is low, and needs draining, especially at the point through which plaintiff constructed said ditch or drain. Plaintiff further says that said drainage or ditch was constructed, tiling laid, and completed, in the first part of last January; that the same was in use from that time until the 1st of March of this year, when the defendant dug down into said ditch where it was constructed through her property, or caused it to be done, as plaintiff is informed, and took out, or caused to be taken, two whole joints of the tiling which had been planted therein for the purpose aforesaid by the plaintiff, destroying the connection, and obstructing the drainage of plaintiff's property, and rendering useless to plaintiff said underground sewerage, which plaintiff had constructed at great expense. Plaintiff further says that he suffers an irreparable injury and damage to his property by reason of said obstruction; that said ditch or drain was constructed with assent of the defendant; that said assent was given in consideration of the advantages said ditch or drain would be to defendant's property in draining it, and for the further consideration of the privilege extended to defendant of tapping said ditch or drain when she desired to drain the water from

her residence or otherwise, and for other considerations; and that said right was accepted upon the assent of the defendant, and the said drainage or ditch constructed and used, and said expenditures made, upon that assent. The plaintiff therefore prayed that an injunction be granted him, restraining and enjoining the defendant from further obstructing and disturbing said ditch or drainage, and requiring said defendant to restore and repair said ditch or drainage so obstructed and disturbed by her, and from in any way interfering with plaintiff's rights in said ditch or drain. On the 11th day of march, 1895, an injunction was awarded as prayed for, to take effect when the plaintiff, or some one for him, should execute bonds therein required, in the penalty of three hundred dollars, which order was complied with. The defendant demurred to the plaintiff's bill, claiming that it was not sufficient in law: First, because the bill does not show upon its face that there was some note or memorandum in writing, signed by the party to be charged thereby, or his agent, giving the plaintiff the easement or right claimed in his bill; second, because the bill does not clearly and specifically set forth the grounds for the alleged irreparable injury to the plaintiff, so that the court may pass upon the facts thus alleged as a matter of law. The defendant Margaret N. Brown filed her separate answer, putting in issue the material allegations of the plaintiff's bill. Several depositions were taken by the plaintiff and defendant, and on February 25, 1896, the cause was finally heard, and it was decreed that said demurrer of defendant be overruled; and the court being of opinion that the cause was for the plaintiff, and that he was entitled to the relief prayed for in the bill, perpetuated said injunction, and perpetually restrained and enjoined the defendant, Margaret N. Brown, from disturbing or obstructing the drain in this cause mentioned, and from this decree the said Margaret N. Brown obtained this appeal.

The first error assigned and relied upon was claimed to be in perpetuating the injunction awarded to the plaintiff; the second error was claimed to be in overruling the demurrer of the defendant to the bill; and the third, in denying the defendant affirmative relief prayed for in her answer. The first two assignments of error are so inti-

mately connected, both being dependent upon questions of law and fact suggested by the pleadings in the cause, that we may consider them together, and in the first case we may consider what is shown by the weight of testimony to have been the true state of facts in regard to the consent or permission given to the appellee by the appellant, Margaret N. Brown, or her husband, Robert L. Brown, to construct the sewer mentioned in the plaintiff's bill across the lot owned by said Margaret N. Brown. Upon this question, Dr. R. L. Brown, in answer to the fifth question asked him, which reads as follows: "State, please, whether you ever made any agreement with the plaintiff, or gave him any consent to dig, construct, or lay that ditch through the lot of the defendant,"—replied: "I never gave him any consent, or any permission of any kind, direct, or indirect, written or verbal, to dig a ditch or use a ditch through the lot of my wife, in Buckhannon, where I am informed he has dug a ditch 88 feet 9 inches long, and 4 feet deep, for the drainage of his building on the corner, or for any other purpose." On the other hand, Loyd J. Wells, a witness for the plaintiff, in answer to question two, when asked, "What conversation, if any, did you hear between F. C. Pifer and Dr. R. L. Brown concerning the construction of said ditch through defendant's lot?" answered: "I heard Mr. Brown tell Mr. Pifer he could go through there. I never heard anything said about damages, any way. I heard Mr. Brown say that he might want to tap the ditch some time, and he also said, when he dug the ditch,—when he put the tiling in,—to put the clay dirt on the bottom and the rich dirt on the top. Mr. Brown allowed that it would be an advantage to his lot; that it wouldn't be no disadvantage." And in answer to another question this witness stated that this conversation occurred some time in December. Spencer Boylen, another witness for the plaintiff, in his deposition says, "Mr. Pifer said he would see Mr. Brown, and see if he could get permission," in response to a question asking, "what conversation, if any, did you hear between F. C. Pifer and Dr. R. L. Brown concerning the construction of a ditch through the lot of the defendant, as laid down on the plat by a green line?" The witness proceeds as follows: "A few days after, Mr. Pifer was there on the work. He said

he would go and see Mr. Brown about getting permission. He was gone some little time and he and Mr. Brown came up on the wall where we were at work. The first thing that I remember of hearing Mr. Brown say was, 'Be sure and put it low enough, so it will not interfere with my garden.' Mr. Pifer told him he would do that; that it would have to go into the ground pretty deep, so it would drain from the bottom of his cellar. They talked on there for some little time about the putting up of a wall and the building, and the last thing I remember of hearing Mr. Brown say was to be sure, when they put back the dirt, to put the good dirt on top." A. B. Clark, another witness for the plaintiff, was asked this question: "State what you may know of an agreement between F. C. Pifer and Dr. R. L. Brown to drain the cellar of F. C. Pifer by digging a ditch through Mrs. Brown's lot to intercept the drain or ditch through N. C. Louden's lot." Replied: "Well, I heard a conversation between Dr. Brown and Mr. Pifer in regard to it. A part of the conversation I did not get, but the end or finishing up of the talk, I heard. About the last thing I heard was: 'Go ahead and put in your ditch; put it down deep,'—about 4 feet it was, I think they said; 'to be careful and fill the earth back so it will not injure my garden.' That was about the amount of it." This witness also fixes the date of the conversation some time in December, 1894.

The plaintiff, F. C. Pifer, also testified in the cause that he went to Dr. Brown, and asked license or permission to put down a tiled drain through his (the defendant's) premises. After some conversation in regard to it, Dr. Brown gave him permission to put a drain through his premises, on condition that he would not disturb his garden (which is to say, in a way that would not interfere with his vegetables, growing or planted), or, further, that he should be allowed to tap and use the drain in case he himself should wish to drain his cellar, or in case of waterworks in Buckhannon, and he should use the water privilege,—have the benefit of the drain to conduct away the waste water. This conversation occurred some time in December, 1894. Witness also states that he began the work of constructing said sewer on the 18th or 19th of January, 1895, and the tiling was laid some three or four days

afterwards, and as soon as it thawed sufficiently he replaced the dirt in a workmanlike manner; leaving on the surface the rich or dark soil, as agreed with Dr. Brown. In answer to another question, he says he received a letter from Dr. Brown, from Mt. Iron, St. Louis county, Minn., dated January 29, 1895, which was the only letter he had received from him since he left Buckhannon, a copy of which letter is filed with this deposition, and reads as follows: "Mt. Iron, St. Louis Co., Minnesota. Jan. 29th, 1895. F. C. Pifer, Esq.—Dear Sir: My wife informs me that you have taken the liberty to put a ditch through my premises, and that you said I had given you permission so to do. Under no consideration, and for no money, will I permit a ditch through my place, unless it be terra-cotta pipe 4 feet under ground, and have outlet clear beyond the premises,—I to be the judge how far beyond; and then only in consideration of $50 to be paid to my wife on the acceptance of the contract by me. If this don't suit you, and you leave the ditch there, I will sue you in fifteen days from this date for damages. Very respectfully, Robert L. Brown." Said witness also identified the hand writing of said Robert L. Brown, and stated that he believed this letter to have been written by said Brown, and when asked in what direction would the surface water from his lot naturally flow, answered, "towards and through the defendant's lot." Said witness also states that there was a cellar under his building at the time he bought it, and, from its appearance, it has been built for a long time; it was drained by means of a wooden ditch or sewer towards the defendant's property, entering the defendant's property very near where the new ditch is located,—and further states that said new ditch had been in use about two weeks before it was disturbed.

The witness Spencer Boylen, in his deposition, states that the ditch, where it is dug, is the practical and natural drainage of said Pifer lot. He also states that, in constructing said ditch through the defendant's lot, the workmen cut the old sewer which had been used to drain the cellar under the old building about six or eight feet inside of Mrs. Brown's lot. The defendant Margaret N. Brown, in her deposition, says, when asked: "When, and under what circumstances, did you first learn that the plaintiff,

Mr. Pifer, was about to construct a ditch through your lot?" "I first learned this on the 21st day of January, 1895, when I saw Mr. Pifer with the surveyor, Mr. Mullins, running a line diagonally across my garden lot; and on the 22d day of January Mr. Pifer came to my door, and said to me: 'Mrs. Brown, I don't want you to think I am taking too much liberty in digging this ditch through your garden, but I spoke to Dr. Brown about it before he left home, and he said it was all right for me to do it, provided I left everything just as I found it; and, for fear he forgot or neglected to tell you, I thought best to come and say to you I was ready to begin it.' I replied, after some hesitancy: 'If you have permission from Dr. Brown to dig this ditch, and to leave everything as you find it, I suppose it is right for you to do it.'"

Now, the question of fact in regard to the understanding and agreement between the plaintiff and R. L. Brown as the agent of his wife, and also the question of fact as to the natural course of the drainage or flow of water from the plaintiff's lot, although there may be some conflict in the testimony with reference thereto, were passed upon by the court, which by its final decree found in favor of the plaintiff; and this Court has held in the case of *Smith* v. *Yoke*, 27 W. Va. 639 (first point of syllabus), that: "Where the decree sought to be reversed is based upon depositions which are so conflicting, and of such a doubtful and unsatisfactory character that different minds and different judges might reasonably disagree as to the facts proved by them, or the proper conclusion to be deduced therefrom, the Appellate Court will decline to reverse the finding or decree of the chancellor, although the testimony may be such that the Appellate Court might have pronounced a different decree if it had acted upon the cause in the first instance." And the same thing is held in the case of *Doonan* v. *Glynn*, 28 W. Va. 715; *Prichard* v. *Evans*, 31 W. Va. 137 (5. S. E. 461); *Bartlett* v. *Cleavenger*, 35 W. Va. 720 (14 S. E. 273). Now, the court below found the fact that Robert L. Brown, acting as the agent of his wife, consented to the construction of this sewer under the lot which belonged to his wife; the appellant, Margaret N. Brown, at the time the appellee was about proceeding to open the ditch through her lot for the

purpose of laying down the tile, having, as she states in her testimony, told the appellee that if he had permission from Dr. Brown to dig this ditch, and to leave everything as he found it, she supposed it was right for him to do so. The evidence shows that he did have permission from Dr. Brown, and it also shows that the work was done in the manner that Dr. Brown said it must be done, in the letter written to the appellee from Minnesota, dated January 29, 1895. And the evidence clearly showing, if the witnesses who were examined are to be regarded as entitled to equal credibility, that the plaintiff, Pifer, had a verbal permission from the defendant Brown to construct this underground drain through and under the lot belonging to his wife in the manner he did, it is clear that the plaintiff made no misrepresentation and practiced no fraud upon the defendant Margaret N. Brown in the absence of her husband. And the evidence further shows that said R. L. Brown acted as the agent of his wife in matters of this character, and it appears from her own testimony that she was willing to submit to his judgment, defer to his opinion, and abide by the agreement made by him in the matter. At any rate, she so expressed herself when approached by the plaintiff on the day he was about proceeding to open the ditch. We must therefore say that the court committed no error in finding that a parol license was given to the plaintiff to construct said underground drain through and under the defendant's lot, and that in pursuance of said license, and in accordance with its terms, said underground drain was constructed. The question, then, presented by the record, is whether such license, after it has been acted upon and executed, can be revoked at the will of the licensor. Upon this question the authorities are conflicting, and the question is, to some extent, dependent upon the circumstances surrounding each particular case. The defendant Margaret N. Brown was present and saw this work progressing when the plaintiff proceeded to dig the ditch, and the only restriction she placed upon her unqualified consent to the work being done as the plaintiff proposed was that it should have been authorized by her husband. That it was so authorized, we must say that the circuit court was fully warranted in finding from the testimony.

This brings us to the question as to the legal effect of a parol license of this character. Will a court of equity allow it to be revoked, at the pleasure of the licensor, after money has been expended and the work completed in pursuance of the license, before the licensee has had any opportunity to derive any benefit from his expenditure and labor? Under the head of "Rights by License," Chancellor Kent says, in volume 3, page 452: "The law is solicitous to prevent all kinds of imposition and injury from confidence reposed in the acts of others, and a parol license to do an act on one's own land affecting injuriously the air and light of a neighbor's house is held not to be revocable by such neighbor after it has been once acted upon, and expense incurred. Such a license is a direct encouragement to expend money, and it would be against conscience to revoke it as soon as the expenditure begins to be beneficial. The contract would be specifically enforced in equity. Such a parol license to enjoy a beneficial privilege is not an interest in land, within the statute of frauds." Authorities not wanting in respectability may be found on both sides of this question. So, in the case of *Le Fevre* v. *Le Fevre*, 4 Serg. & R. 241, cited in Washb. Easem. p. 441, the facts were as follows: The owner of a parcel of land sold a part of it to the owner of a tanyard, together with a right to draw water by pipes laid in the earth along a designated line through the vendor's land from a stream on his land to the vendee's tanyard. After these pipes had been laid and used for a considerable time, it was orally agreed between the parties that they should be taken up and laid in another place than the line indicated by the deed, which was accordingly done by the vendee at his expense. After lying in this situation for six or seven years in connection with the business of the tanyard, the owner of the latter sold the same, with the water right which he had purchased, to the present plaintiff. Soon after this the original vendor cut off the pipes within his own land, and stopped the flow of water therein to his tanyard, and and for this the plaintiff brought his action.

The court held: That, as the pipe was laid in the manner indicated by the owner of the land at the the expense of the owner of the tanyard, a court of equity would treat the latter as owning the right to maintain it there—First, by

having incurred expense in laying it down under an agreement with the landowner that he should have such right; and, second, by his being in possession. That the court would require the landowner to execute this agreement on his part, and would have granted an injunction to prevent the landowner from prosecuting a suit at law for laying down the pipe, and that courts of law would not suffer him, under these circumstances, to take the law into his own hands, by cutting or destroying the aqueduct. To the suggestion that the laying down of the pipe was done by a parol license only, which was revocable, the court held that after being executed, and expense thereby incurred by the licensee, it could not be revoked, so as to make the licensee a wrongdoer. This case, it is believed, states the doctrine on this subject in Pennsylvania, and several other cases might be cited in that state announcing the same doctrine. This ruling has been followed and announced in several of our states. So in the case of *Wharton* v. *Stevens*, 84 Iowa, 107 (50 N. W. 562), it was held that: "If surface water flows by a well-defined channel, be it in a ditch, or swale in its primitive condition, and seeks to discharge in a neighboring stream, its flow cannot be retarded or interferred with by a landowner to the injury of neighboring proprietors. Mandatory injunctions may issue to compel the removal of obstructions placed in a ditch so as to retard the flow of the water as it was before such obstructions were built." So, also, in the case of *Metcalf* v. *Hart*, 3 Wyo. 513 (27 Pac. 900), and (31 Pac. 407), it is held that: "When, by authority of a parol license, the licensee has been put in possession, and induced to place valuable improvements on the land, of which he would be defrauded and robbed by the revocation of the license, equity will interpose, and either forbid the licensor to revoke the license, or impose terms such as will avoid fraud and accomplish what justice and good conscience demand." Again, in the case of *Wickersham* v. *Orr*, 9 Iowa 254, it was held that: "When a portion of a partition wall has been erected upon a lot under and by virtue of a license from the owner thereof, such license cannot be revoked, either by the licensor or his grantee with notice." In the the case of *Rhodes* v. *Otis*, 33 Ala. 578, the court held that: "A parol license to float spars down a private stream, ob-

tained for valuable consideration, cannot be revoked by
the grantor when the grantee, having acted upon it, would
be injured by the revocation. The doctrine of estoppel
*in pais* applies to such a case." So, again, in the case of
*Cook* v. *Pridgen,* 45 Ga. 331, it was held that: "A parol li-
cense to one to enjoy a permanent easement upon the land
of another (as to back water upon it) is an interest in the
land, and must be in writing, by the statute of frauds,
and is void in law." But if the licensee in pursuance of
the license goes forward, and for the enjoyment of the
easement makes large investments, and the easement be
one in its nature permanent, equity will decree a specific
performance as in other cases of a part performace by one
party of a parol contract for a sale of lands. To the same
effect, see *Beatty* v. *Gregory,* 17 Iowa, 109. On this same
subject, Rice, in his valuable work on the Modern Law of
Real Property (page 511), says: "Where a parol license
has been executed and acted upon, and expenses incurred
in perfecting an easement over the land of another in re-
liance upon the parol license previously granted, it cannot
afterwards be revoked without placing the licensee in
*statu quo.* [Citing *Woodbury* v. *Parshley,* 7 N. H. 237.]
In such cases, equity holds that, for remedial purposes, the
license shall be deemed an executed contract. [Citing
*Snowden* v. *Wylas,* 19 Ind. 14; *Beatty* v. *Gregory,* 17 Iowa
114, *supra*; *Dempsey* v. *Kip,* 61 N. Y. 462; *Lacy* v. *Arnett,*
33 Pa. St. 169; *Meek* v. *Breckenridge,* 29 Ohio St. 642.]
\* \* \* It is now well settled in this country that, as be-
tween private person, a parol license, though primarily
revocable, is not so when the licensee has executed it, and
in so doing has incurred expense. This doctrine was an-
nounced as far back as 3 Ga. 82 in *Sheffield* v. *Collier,*
and again in *City of Macon* v. *Franklin,* 12 Ga. 239, in
which Judge Nisbet said: 'The rule is, as stated, that a pa-
rol license is revocable; but it has some exceptions. If the
enjoyment of it must be preceded necessarily by the ex-
penditure of money, and the grantee has made improve-
ments or invested capital in consequence of it, it becomes
an agreement for a valuable consideration, and he is a
purchaser for value.'" Citing *Winham* v. *McGuire,* 51
Ga. 578, and *Railroad Co.* v. *Mitchell,* 69 Ga. 114. On
the next page the author says the distinction between an

easement and a license is often so metaphysical, subtle, and shadowy as to elude analysis."

On the other hand we find numerous authorities which hold that a mere parol license of this character is revocable at the will of the licensor. Cooley, Torts (2d Ed.) 360, says, after speaking of a license to erect a building on the land of another, and the right, to remove the same : "But a license can not be coupled with an interest in the lands, unless created by deed, or by such other instrument as is sufficient to convey such an interest under the statute of frauds. Therefore rights of way, sales of growing trees, permission to flow lands permanently, or to carry water over or pipes under the land of another, are mere licenses, and revocable as such, unless created or made by deed." Citing the case of *Wiseman* v. *Lucksinger*, 84 N. Y. 31, where it is held that : "A mere license to drain is not made irrevocable by the fact that a valuable consideration was paid therefor, and that a right of drainage through the lands of another is an easement requiring for its enjoyment an interest in such land which can not be conferred by parol license. It can only be granted by deed or conveyance in writing." Danforth, Judge, in delivering the opinion of the court, says : "A right awarded to the plaintiff to have his drain pass through the defendant's land is, in the terms of the judgment, an easement, and, for its enjoyment, requires that the plaintiff shall have an interest in the defendant's land." Citing *Hewlins* v. *Shippam*, 5 Barn. & C. 221. The question was whether a right to a drain running through the adjoining lands could be conferred by parol license, and, after the fullest examination, it was decided that it could not; also citing *Cocker* v. *Cowper*, 1 Cromp. M. & R. 418,—a similar case. The plaintiff therein sued for the obstruction of a drain which had been originally constructed at his expense on the defendant's land by his consent, verbally given. After it had been enjoyed for eighteen years the defendant obstructed it, and it was contended by the plaintiff that the license, having been acted upon, could not be revoked. But the court held that *Hewlins* v. *Shippam* was decisive to show that such an easement can not be conferred except by deed. And the same, in substance, is held in *Cronkhite* v. *Cronkhite*, 94 N. Y. 323. In that case water had

been carried in pipes across a tract of land under a parol license for forty years, and, although a consideration was paid, it was held to be revocable at the pleasure of the licensor or his successor in interest. See, also, *Wilkins* v. *Irvine*, 33 Ohio St. 138, upon the same question, where it was held that: "A written license, not under seal, to enter upon and imbed water pipes in the land of another, with privilege to enter and repair them, created no interest in or incumbrance upon the land, such as would disable the owner thereof from making a good and sufficient deed conveying a good title thereto." So, also, in the case of *Owen* v. *Field*, 12 Allen, 457, it was held that: "An owner of land may at any time revoke his oral license to lay an aqueduct through the same; and, after doing so, he will not be restrained in equity from cutting off the aqueduct." Wood, in his valuable work on the Statute of Frauds (page 28, § 10), thus propounds the law on this question: "There are few instances in which a parol license to do acts upon the land of another is not revocable. In some of the states, as we have seen, it is held that a parol license which is executed, and has involved the expenditure of large sums of money, is not revocable, upon the ground that the party giving it is estopped from revoking it. But this doctrine seems to us to be in defiance of the statute, and to operate as a complete abrogation of its salutary provision in respect to the transfer of interests in land, and is an instance of judicial legislation which is wholly unwarranted. If a person, in view of the statute in this regard, of which he is presumed to have knowledge, sees fit to go on and make extensive and permanent improvements upon the lands of another without first investing himself with a legal right to enjoy them, it is difficult to see on what ground a court of equity should interfere to protect him against the consequences of his folly, or why the owner of the land, who has merely consented to such erections or improvements, should have his estate thus burdened with a permanent easement, and be equitably estopped from revoking this authority and ridding his premises of a burden which the statute provides shall only be imposed in a certain mode."

Angell on Water Courses (page 322, § 169) says: "The case of *Fentiman* v. *Smith* (4 East, 107) is clear and pos-

itive in its language. The plaintiff in that case claimed to have a passage for water by a tunnel over the defendant's land, and Lord Ellenborough lays it down distinctly: 'The title to have the water flowing in the tunnel over defendant's land could not pass by parol license without deed, and the plaintiff could not be entitled to it, as stated in his declaration, by reason of his possession of the mill; but he had it by license of the defendant, or by contract with him, and, if by license, it was revocable at any time.'" Washburn, in his work on Easements and Servitudes, on page 431, § 14, says: "It should, however be stated that, as understood in England and most of the states, a parol license to construct a water course in one's land is revocable, and no title is thereby gained, either to the land, or to any right to maintain the water course. An enjoyment under such a license would neither be by grant nor adverse user." Washburn on Real Property (volume 1, p. 632, § 10) says: "Another class of cases where the license may be revoked is where the act licensed to be done is to be done upon the land of the licensor, and, if granted by deed, would amount to an easement therein. If such license be by parol, it may be revoked, as to any act thereafter to be done, even though, in order to enjoy it, the licensee may have incurred expenses upon the premises of the licensor. Thus, where A., by B.'s license, laid an aqueduct across B.'s land, who then revoked it and cut off the pipe that conducted the water, the court, as a court of equity, refused to interfere, because B. had a right to revoke the license at his pleasure." The law on this question is also stated in the sixth volume of the American & English Encyclopedia of Law (page 18), under the head of "Easements": "The right of drainage through the lands of another is an easement requiring for its enjoyment an interest in such lands, and cannot be conferred except by deed or conveyance in writing. It cannot be conferred by parol license, and a license to lay a drain does not vest any title or give any irrevocable easement in the land, even though a consideration is paid for the same. It is revocable at any time, even after twenty years' user; for, the use being by consent of the landowner, no prescriptive right is gained."

Now, while I find it extremely difficult to reconcile the

conflict in authorities upon this question, which, as we have seen, is not influenced or controlled by the uniformily accepted and well-established rulings in regard to part performance or executed contracts, and the influence thereof in withdrawing the agreement from the effect of the statute of frauds, and which is not to be determined or settled in accordance with the usual presumption arising from possession, user, and the lapse of time, I am led reluctantly, under the peculiar facts of the case, to the conclusion, from the best examinations I have been able to make of the authorities at my command, that a mere oral license to construct an underground drain by one lot owner in a town to a neighboring lot owner, for the purpose of draining the lot of the licensee, although executed and in full use and enjoyment, is revocable at the pleasure of the licensor, and that the fact of entire performance of the contract, even though with full consideration, will not entitle the licensee to the permanent use of the drain. This question is to some extent a new one in this State, and we are compelled to go beyond our borders, and examine the English and American authorities upon the subject, and in so doing have found an almost irreconcilable conflict in the rulings of the courts upon almost precisely the same state of facts; and the difficulty in arriving at the true state of facts from conflicting testimony, united with the feeling that is so frequently engendered by claims of this character, affords cogent arguments in favor of the conclusion that rights of this character should be conferred by deed, and that they should not depend for their validity upon the slippery memory of man, even where he is disposed to be fair and honest. My conclusion, therefore, is that the decree complained of must be reversed, with costs.

*Reversed.*