ROBERT JOHNSON, APPELLEE, v. SHERMAN COUNTY IRRIGA-
TION, WATER-POWER & IMPROVEMENT COMPANY, AP-
PELLANT.

FILED JANUARY 8, 1902. No. 10,526.

Commissioner's opinion, Department No. 1.

1. **Mill: Water-Power: Adjoining Landowners: Right of Flow-
age: Appurtenance.** Where a mill is erected and a water-power
obtained by the aid and co-operation of adjoining landowners,
any right of flowage over their premises of water for the mill
arranged for and contemplated by the owners, as subscribers
towards its construction, becomes appurtenant to the mill.

2. **Waterflow: Encroachment Without Agreement.** A subsequent
use for less than ten years of real estate for flowage of water
by gradual encroachment without agreement with the owners,
and without compensation to them, and not contemplated at the
time of the subscription, will not create an interest in the real
estate so flowed, nor establish an irrevocable license to so use it.

3. **Fee Title: Easement.** Only a right to enjoy the privilege and no
fee title nor right to exclude the owner, can, in any case, be
established by mere user of a privilege of flowage.

APPEAL from the district court for Valley county.
Heard below before KENDALL, J. *Reversed.*

*Richard J. Nightingale,* for appellant.

*Othman A. Abbott, contra.*

HASTINGS, C.

The essential question presented by this case seems to
be the nature and extent of the right to flow real estate
and to divert water which can be acquired by mere
acquiescence for a period short of ten years on the part
of the riparian owners.

In March, 1887, John G. Schaupp visited Arcadia, on the
Middle Loup river, with a view to establishing a flouring
mill. He found where that river crosses section 26, town-
ship 17, range 16 west, an island half a mile long, and com-
paratively narrow, and on the northeast of it a channel,
through which a strong current was then running. He

found at a distance of 400 yards from the river's left bank the almost empty channel of Hawthorne creek, which he concluded was three and one-half feet below the river-bed. He thought he could divert the water of the stream across the bottom lands to the creek-channel at a point in the southeast quarter of the section, and, using that channel for a tail-race, secure a strong water-power. Mr. Schaupp proposed to the citizens of Arcadia to erect a mill if they would give him four acres for a mill-site, a location for a head-race, and $1,500 in money. John Wall agreed to give the mill-site on Hawthorne creek, and a strip of land sixty feet wide for a race-way leading to the river. Wall at that time owned the south half of section 26 and some irregular lots in the north half, among them lot 2, which was the irregular equivalent of the southeast quarter of the northeast quarter of this section. This lot 2 he had agreed on March 14 of that year to sell to M. L. Fries of Arcadia. He had received $200 on it, but did not make the deed until April 29. In the meantime he had made this agreement with Schaupp. The latter, however, at that time intended to go nearly west from his mill-site to a point on the river, and neither he, Wall nor Fries supposed he would need to pass over any land north of the half-section line. What was the form of the agreement with Schaupp, there is nothing to indicate. But during the summer he dug his race-way partly on Fries's land. Its original course is somewhat in dispute, but seems to have been nearly straight west to the river. He also put up his mill. Schaupp seems to have received no deed until November 21, when, owing to the fact that he was incumbered with old judgments, he had Wall make a deed to August Schaupp, a son, and to Charles B. Moore, a son-in-law, jointly, for four acres specifically described, near the northeast corner of the southeast quarter of the section, and for a strip of land sixty feet wide, "being 30 feet on each side of a line commencing at a point 13.3 ch. west, and 85 links south of the S. E. corner stake of the N. E. ¼ of Sec. 26, T. 17 N., R. 16 W., and running S., 77° 45′ W., 7.10 ch., thence north 87°

west to the south line of southwest $\frac{1}{4}$ of N. E. $\frac{1}{4}$, section 26, Tp. 17 N., R. 16 W. The variation of the compass 10° 45' east." To erect his mill he procured materials from various parties, among them the Chicago Lumber Company, Nordyke, Marmon & Co., the Smith Middlings Purifier Company, and some others. The first named filed a mechanic's line, and the others, at the time of making the deed, November 21, 1887, obtained a mortgage. This lien and mortgage were foreclosed, and on July 13, 1894, a deed of the mill premises, described as above stated, was made to plaintiff, as trustee, for the foreclosing creditors. In the meantime in the fall of 1887, Schaupp found that the channel in the river, which was flowing so strongly in the spring, had become nearly dry. He also found that by tapping the river further up and by constructing and banking a race-way, he could get more fall, and, some time about, or shortly after, the date of the deed and mortgage above mentioned, he seems to have pushed his race northwesterly across Fries's lot 2 to the river, near the point on lot 2 where the sand-sluice is now located, and at some time during the year following, or the year after that, to have constructed there a sand-sluice. This first sand-sluice had washed out before August, 1894. Fries and Schaupp never agreed about the terms on which this should be done. Fries claimed damage, and Schaupp refused to pay until he got a permanent water-power. In 1889 or 1890 they agreed upon an arbitration, and an award of $450 in Fries's favor was made, but never paid. In 1889 a 25-horse-power engine was set up to help turn the mill. It was not heavy enough, and in 1891 a 40-horse-power engine was put in, which is apparently still there. In the meantime, and apparently all subsequent to Wall's deed and to plaintiff's mortgage, John G. Schaupp had made various experiments towards placing a dam in the river and had finally gone some distance up the stream, to a point well towards the northwest corner of the section, and placed a partial dam in the river, near the head of the island before mentioned. This was to keep

the current from going down along the right bank, and to
turn the water into the channel between the island and the
left bank, and so into his race-way.   The dam was appar-
ently started where it at present stands in the year 1890
or 1891, without any agreement with the owners of the
banks, but with their knowledge, and with no objection on
their part.   Soon after the sheriff's deed of July 13, 1894,
the trustees made a lease of the mill to Schaupp until the
July following, in consideration that Schaupp should keep
$3,000 insurance on the property, and pay the taxes.   This
lease was never renewed, but Schaupp retained possession,
and apparently complied with its terms, until August 11,
1897, when, for an agreed consideration of $100, he sur-
rendered possession to plaintiff.

In the meantime, immediately after this sheriff's deed
in August, 1894, the irrigation company, defendant, was
formed.   It purchased from Schaupp his interest in the dam
at the head of the island, purchased the banks on both
sides at that point, and purchased the strip of land from
that point down the old channel bed between the left bank
and the island to Fries's premises.   It also bought the old
race on Fries's land down to the south line of his lot 2.
From that point it purchased a 120-foot strip along the
north side of the half section line on Fries's lot 2 and on
the southeast quarter of the northeast quarter of the sec-
tion to its east line.   This southeast quarter of the north-
east quarter was then owned by John G. Schaupp, by a pur-
chase made apparently in 1890 or 1891, from one Moncrief.
The latter, after the race-way was extended, and Fries had
been awarded damages for the flooding of his land, had
claimed damages for flowing this southeast quarter of the
northeast quarter, apparently by the backing up of the
water in the Hawthorne-creek channel, which was used as
a mill-pond, and Schaupp had settled the matter by pur-
chasing the entire forty acres, and then in August, 1894,
as above stated, conveyed a strip along its south line to the
irrigation company.   After securing deeds to all this prop-
erty, the irrigation company commenced at once repairing

37

the dam near the head of the island, where it was broken in places and likely to be destroyed, and spent about $200 in so doing. It put in an effective tow-head to turn the water into the head of the channel above mentioned, and replaced the sand-sluice which had been washed away at the point where the water is led out of this channel upon the Fries land. It deepened the race-way on the Fries land and dug a canal from the race-way around to the north of the mill to a point near the northwest quarter of the four acres of the mill-site, and there fixed a gateway on its own premises near the east line of section 26 leading out into some seventeen miles of irrigation canal, which it constructed southeasterly towards Loup City. It also deepened the race-way along the half-section line of 26 by additional excavations, most of which were on its side of the line. This work above the mill cost some $1,200 more in addition to the previous expenses on the dam and to the price paid for the lands; and in the construction of irrigation works to the southeast, it claims to have expended enough to bring the whole amount to about $35,000. The use by the defendants of the old race-way for a short distance along the half-section line, and in part on the south side of it, seems to have been under Schaupp's suggestion. Arrangement was made with him that he was to have the use of the water for the mill when not needed for irrigation purposes. He was also to attend to the head-gate of the irrigation company's canal, and was to keep the intake and race-way in repair. He says that, as a result of this work, about a week before giving up the mill he got a satisfactory water-power for the first time in all his years of effort. The irrigation company seems to have proceeded regularly, and to be entitled to divert the water, unless there is a prior right in the owners of the mill. There seems to have been some use of water-power in connection with the mill all the time, with only interruptions by accidents, after Schaupp got his conveyance. The strip of land described in that original conveyance and in the mortgage appears now not to reach to the south

line of the southeast quarter of the northeast quarter except by passing into the river.  It is clear that Schaupp arranged with nobody but Wall for flowage rights, and with no one at all for a dam.  The dam does not aim at confining the water of the river, but only at throwing it over against the left bank, and in part into the canal.  No right to obstruct the stream beyond such as comes from a noninterference on the part of the owners was ever acquired by any one until the purchase of the banks on both sides at the point of the intake by the defendant company in 1894. At the time of the institution of the irrigation company's plant there seems to have been no trustworthy water-power at the mill, and little use of it, except to work a pump supplying the engine with water and sometimes to grind feed.   When there was a strong south wind throwing the water to the left bank of the river there was sometimes a good power.   Plaintiff alleges an agreement, oral or in writing, between the various owners of the property affected, and Schaupp, in the spring of 1887, to make to Schaupp an absolute title to the strip of land constituting the present race-way in consideration that Schaupp should erect the mill.  He says that Schaupp erected the mill and constructed the race-way at an expense of $10,000; that it was completed in 1887, and thereafter until October 1, 1894, Schaupp remained in notorious and peaceable possession of the premises and use of the premises as a mill-race. Plaintiff alleges the liens held by his beneficiaries, their foreclosure, an order of sale issued on March 29, 1893, confirmation of sale and deed to him as trustee thereunder. He says that Schaupp surrendered possession to him on October 1, 1894, and he thereupon leased to Schaupp to July 1, 1895, and from year to year until July 20, 1897, when Schaupp surrendered the possession as tenant for a consideration of $100; alleges that Schaupp and the other defendants, with notice of plaintiff's rights, without plaintiff's knowledge, and in violation of the lease, conspired together to procure conveyances of some of these premises to the irrigation company; that the latter entered on the

premises, made extensive improvements, and constructed a canal to draw away, for the benefit of the irrigation company, the water then flowing through the race, and conspired to maintain such canal and draw water into it, and refused to allow their excavations to be filled up, and prevented plaintiffs from repairing the mill-race. There is an allegation that defendants interfered with the operation of the mill, and that the irrigation company claims to own the race and water-power. Damages are asked, and an injunction against any of defendants interfering with the head-race and the flow of water to the mill, or with the operating of it.

The irrigation company admits its incorporation; that it operates a canal; that Wall owned the lands conveyed by the sheriff's deed; that Schaupp built the mill; that the beneficiaries furnished materials; that the foreclosure and sale were had and deed made to plaintiff as trustee; that Schaupp leased the premises and subsequently surrendered them; disclaims all interest in the premises described in the sheriff's deed. With reference to the disputed strip of land constituting the race-way, it sets out its appropriation and use of the water by proceedings under the statute, commenced August 13, 1894; its conveyances from the various owners of the strip of land 120 feet wide from the dam to the east side of said section 26, and including all the portion claimed by plaintiff in the north half of the section; and ownership of the right bank of the river abutting upon the dam; its possession from August 11, 1894, to the commencement of this action in August, 1897, and improvements upon the dam and race-way of a value of not less than $4,000, and irrigation works below, making a total value of $35,000; and says that this entire plant was constructed with full knowledge of plaintiff, and was operated during the three years without objection on his part; denies any right in Schaupp or the plaintiff to either the disputed strip of land or the flow of water; alleges failure of Schaupp's attempt to create a water-power, and that all possessory acts of his in attempting to build a dam

or race-way in the north half of the section were tres-
passes; alleges abandonment of the water-power, and that
neither plaintiff nor Schaupp had paid anything for the
disputed premises, or expended anything in the creation of
a water-power as it now exists.

As before suggested, the question raised is as to the ex-
istence of title in the plaintiff to the strip of land claimed
for a head-race in the north half of the section, and also
as to the extent and character of the water right possessed
by plaintiff. As to the first, it is clear from the evidence
that no such agreement as plaintiff alleges ever existed,
and no title in the north half of the section was acquired
by Schaupp prior to the mortgage, or attempted to be con-
veyed by any one representing him to plaintiff or to plain-
tiff's beneficiaries. While the trial court found generally
for the plaintiff, the specific findings are only that plaintiff
had a right to the water and to flow the lands in the north
half of the section in order to get it. The temporary in-
junction was made perpetual, and defendants were en-
joined from maintaining or using any head-gate or canal
at or near said premises to conduct or draw off water from
the race, and from interfering with the race or sand-sluice
connected with it. This, of course, gives the water to
plaintiff and to the beneficiaries in his trust, and not only
that, but it forbids the defendant company from using its
own lands and dam to put water into this race to which it
holds the title, and forbids it interfering with a sluice on
its own lands, built by itself.

·It seems clear that the decree as it stands can not be
sustained. It gives a degree of control to the mill-race as
it now exists which only belongs to one who holds in fee.
As above stated, the evidence is very far from disclosing
any such title in any portion of the north half of the sec-
tion on the part of plaintiff. The fee to the race north of
the centre line of the section was never in Schaupp, nor
agreed to be. His only arrangement for any conveyances
was with Wall. Wall had sold lot 2 before such agreement
was made, and the agreement with him only contemplated

the acquisition of land in the south half of the section. There is absolutely nothing to show any greater rights in Schaupp, either before or after the mortgage, as against any one besides Wall, than are given by mere silent acquiescence in his extending his race northwards after the mill was built. It is true that both Round and Fries, owners above, were subscribers to the fund raised to help build the mill. It is also true that when this was raised the expectation was to tap the river in the south half of section 26, instead of well towards the north line of that section. The race-way granted by Wall strikes the river bank before reaching the centre line of the section where its terms take it. The agreeing testimony of all witnesses wholly prevents the defendants' subscription to the bonus from in any way amounting to an acquiescence on their part in the use of land in the north half of the section for a race-way. Aside from such subscription, there is nothing to show any right as against Round, except his own admission that he told Schaupp in the spring of 1887 that the water might continue to go down the channel between this island and the river bank forever, so far as he was concerned. As against Fries there is nothing except that the race, as originally constructed, unintentionally, and because of ignorance of the lines, passed in part over his forty acres, and the fact that after the mill was done, and water was found scanty and power weak, the race was with his knowledge carried north on his land to get more fall. His objection and claims for damage, which were not paid, because "Schaupp was not ready to fix it up until he got a water-power," are not denied. The use of the river-bed at the point of diversion for the partial dam by which the water was finally turned into the natural but untrustworthy channel to the left of the island, and the building of the sand-sluice and the gates at the point in this channel where the water is turned out into the canal on Fries's land, were wholly without further authority than is given by mere silent acquiescence in the establishment of such structures. All of them were subsequent to the date of plaintiff's mortgage

and mechanic's lien and to the completion of the mill. What is valuable and effective of them seems to have followed the irrigation company's purchase. The dam was broken and washing away, and little water was going into the channel at the head of the island. The sand-sluice was out, and almost no water entering the canal. In this state of affairs the irrigation company bought Schaupp's rights to the dam and the sand-sluice location and raceway, purchased from the riparian owners, including Round and Wall, abutting lands around the dam and sand-sluice, and bought the title to the channel and to the race-way over Fries's land to his south line, and then east to the section line, as stated. Of course, if the implied license to the mill owners to use these premises in the north half of the section was revocable, the deeds of the owners to the irrigation company were a revocation. While there are cases holding that a parol license to use lands for a permanent purpose is irrevocable if expense has on the strength of such permission been incurred to fit them for such use, none has been cited showing that one who knowingly goes upon another's land, without permission, and there, for his own benefit, places materials and expends labor, acquires an irrevocable license. The most liberal rule seems to be that there must be an agreement capable of specific enforcement, or else the circumstances must be such as to render the revocation a practical fraud upon the licensee. This is the position taken by this court in *Newcomb v. Royce,* 42 Nebr., 323. In that case it is held that either the doctrine of specific performance or of estoppel to revoke the license is applicable. The later cases do not tend to extend the use of parol agreements. *Cary Hardware Co. v. McCarty,* 10 Colo. App., 200, 50 Pac. Rep., 744; *Minncapolis, St. P. & S. Ste. M. R. Co. v. Marble,* 112 Mich., 4, 70 N. W. Rep., 319; *Yeager v. Woodruff,* 17 Utah, 361, 53 Pac. Rep., 1045; *Hallett v. Parker,* 39 Atl. Rep. [N. H.], 433; *Lavery v. Arnold,* 57 Pac. Rep. [Ore.], 906, 58 Pac. Rep., 524; *Nowlin Lumber Co. v. Wilson,* 119 Mich., 406, 78 N. W. Rep., 338; *Thoemke v. Fiedler,* 91 Wis., 386, 64 N. W. Rep., 1030;

*Clifford v. O'Neil,* 42 N. Y. Supp., 607; *Crosdale v. Lanigan,* 129 N. Y., 604; *Pifer v. Brown,* 43 W. Va., 412, 49 L. R. A., 497. Many of the foregoing cases refuse to hold a parol license irrevocable, where given in express terms, and large expense incurred, unless the agreement is such as to call for specific enforcement.

The state of facts in this case warrants no finding of an absolute and exclusive right in plaintiff to the dam and to the race-way, with its tow-head and sluice in the north half of the section. The utmost that could be claimed for him or his beneficiaries north of the half section line is a license to maintain the dam and race-way as it was ordinarily from November, 1887, to August 11, 1894, when the defendant company took its deeds and began its improvements. The plaintiff's right to the water and privilege of getting it could be only to the extent of such previous enjoyment. Any use which the owners might choose to make of their property which left unimpaired plaintiff's enjoyment of the water to that extent would manifestly be lawful, and should not be enjoined. It is thus clear that defendants, as general owners of the premises involved, had rights to use their property which are not recognized in this decree, and, to that extent at all events, the decree can not be upheld.

It seems, however, clear that there was during all the time from 1887 until the irrigation company's purchase, with only temporary interruptions, some use of water privileges by the mill. It also appears that the irrigation company, while it controlled the water, made use of a part of the old race-way granted by Wall to Schaupp's son and son-in-law, and conveyed by the sheriff's deed to the plaintiff, and it seems, as above stated, that a part of the irrigation company's excavation is across a corner of the four acres constituting the mill-site. It also appears that the 120-foot strip purchased by the irrigation company along the south line of the southeast quarter of the northeast quarter of section 26 crosses the Hawthorne-creek channel just above the mill, or, in other words, goes through the mill-pond. Evi-

dently, the irrigation company's gate into its canal tapped the mill's reservoir completely. As soon as plaintiffs took possession, the gate-planks were removed, and the mill-pond emptied into the canal. Defendants' employees were instructed also to draw the gates at the sand-sluice and let the water go down the Loup river, if plaintiff attempted to start the mill. By means of this sand-sluice gate and the gate into the canal, defendants evidently had entire control of the water. Did it belong to them? Both these gates are on defendants' own premises. They have, as above indicated, the right to control them, at least to any extent which does not interfere with the mill's water supply as it was enjoyed up to the time of the irrigation company's purchase. It would seem that they have more than that. The occupation of the Fries land for this mill-race by Schaupp was not only subsequent to the original mill subscription, and not contemplated at the time of it, but was against Fries's objection and claim for damages. These damages were never paid nor the award accepted by Schaupp. The flowage when Fries deeded to the irrigation company had not lasted ten years. The company at once assumed control of the race. No right to flow this land can arise out of such a state of affairs. *Wilmington Water-Power Co. v. Evans,* 166 Ill., 548. The defendants, at all events until compensation had been made for the use of their premises, had the right to open the sluice-way and let the water down the Loup river. In the case last cited the doctrine is emphatically laid down, and seems supported by reason and authority, that, where the right exists to condemn premises through the exercise of eminent domain, none is acquired by parol license and user. 2 Lewis, Eminent Domain [2d ed.], sec. 298. Doubtless Schaupp at any time after the erection of the mill and placing his dam in the river had the right to condemn lands necessary for a suitable water-power. The circumstances surrounding the use of Fries's land are not such as to render a refusal on his part to permit its further use by plaintiff equivalent to fraud, and no interest in his land can be held to have passed to plaintiff.

The injunction, then, against the opening of the sand-sluice gates was unwarranted.

It is necessary to examine as to the gate into defendants' canal. As indicated, it is on the southeast quarter of the northeast quarter of section 26, immediately north of the four-acre mill lot. This forty acres of land was purchased by Schaupp, of Moncrief, as stated, as late. as 1890. There is nothing to indicate that Moncrief had anything to do with the starting of the mill, or knowledge of any intention to back water up Hawthorne creek. There is no indication anywhere of any right over this forty acres of land accruing to the mill property before Schaupp's purchase. Nothing is pointed out in the record which would estop Schaupp from asserting his full rights as owner against the mortgagees of the mill. Whatever rights he had in the 120-foot strip passed by his deed to the irrigation company. Plainly, then, the right to maintain the mill-pond, and to prevent the irrigation company from draining it over its own land into its own canal, has never been acquired by plaintiff, and there is no equity in plaintiff's demand for an injunction against the drawing-off of this water into the canal. It follows that the injunction restraining the defendants from the use of their dam, tow-head, sand-sluice and race-way, and from the use of their head-gate into the canal, should be dissolved. It would seem that plaintiff's rights in the premises depend upon something neither alleged nor shown by the evidence with any definiteness, viz., the rights held by John G. Schaupp in this mill-race and water-power on November 21, 1887, at the time the deed was made to Charles Moore and August Schaupp for his benefit, and the mortgage executed by them. It has been sufficiently indicated that in our opinion no irrevocable rights, either over the part of the race in the north half of the section, nor to the dam and sluice-way, nor to the flowage of the bed of Hawthorne creek, north of the half-section line, have been acquired since November 21, 1887. Whatever was appurtenant to the mill at that time passed by the foreclosure and

the sheriff's deed. No rights by agreement in the north half of the section appear from the evidence, and the case made by plaintiff's petition must be held to have failed. Some prior right to draw water from the river over the original race-way, as contemplated at the time of the subscription agreement, and as conveyed by Wall, with a right to condemn for additional race-way and mill-pond, and, when that is done, to have so much use of the water, seems to be the extent of plaintiff's rights. To vindicate them will evidently require an amended petition and a new trial.

It is therefore recommended that the decree of the district court be reversed and set aside, the injunction dissolved, and the cause remanded for further proceedings.

DAY and KIRKPATRICK, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is reversed and set aside, the injunction dissolved and the cause remanded for further proceedings.

REVERSED AND REMANDED.